

FILED by **BG** D.C.

Sep 16, 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. **21-60271-CR-RUIZ/STRAUSS**

18 U.S.C. § 371
18 U.S.C. § 982

UNITED STATES OF AMERICA

vs.

ROBERT GOFF III,

        Defendant.

_____/

## INFORMATION

The Acting United States Attorney charges that:

### GENERAL ALLEGATIONS

At all times material to this Information:

#### Medicare Program

1.     The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States

Code, Section 1320a-7b(f).

3. Medicare covered different types of benefits, which were separated into different program "parts." Medicare "Part A" covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare "Part B" was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

4. Physicians, clinics, and other health care providers, including laboratories, that provided services to beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

5. A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number; (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

6. Payments under Medicare Part B were often made directly to the health care provider rather than to the patient or beneficiary. For this to occur, the beneficiary would assign the right of payment to the health care provider. Once such an assignment took place, the health

2

care provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

### Cancer Genomic Tests

7. Cancer genomic ("CGx") tests used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGx testing was not a method of diagnosing whether an individual presently had cancer.

8. Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Title 42, United States Code, Section 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." Title 42, Code of Federal Regulations, Section 411.15(a)(1). Among the statutory exceptions covered by Medicare were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

9. If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." *Id.* "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

10. Because CGx tests did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGx tests for beneficiaries who did not have cancer or lacked symptoms of cancer.

### Telemedicine

11. Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

12. Telemedicine companies provided telemedicine services to individuals by hiring doctors and other health care providers. Telemedicine companies typically paid doctors a fee to conduct consultations with patients. In order to generate revenue, telemedicine companies typically either billed insurance or received payment from patients who utilized the services of the telemedicine company.

13. Medicare Part B covered expenses for specified telehealth services if certain requirements were met. These requirements included that (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was a practitioner's office or a specified medical facility – not at a beneficiary's home – during the telehealth consultation with a remote practitioner.

### The Defendant and Related Entities

14. Personalized Genetics, LLC ("Personalized Genetics") was a limited liability company formed under the laws of Pennsylvania, with a principal place of business in Pittsburg, Pennsylvania, in the Western District of Pennsylvania. Personalized Genetics was a laboratory that purportedly provided CGx testing to Medicare beneficiaries.

15. Med Health Services Management, LP ("Med Health Services") was a limited partnership formed under the laws of the state of Pennsylvania, with a principal place of business in Monroeville, Pennsylvania, in the Western District of Pennsylvania. Med Health Services was a laboratory that purportedly provided CGx testing to Medicare beneficiaries.

16. **ROBERT GOFF III** was a resident of Islamorada, Florida, in the Southern District of Florida.

### Conspiracy to Solicit and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

From in or around May 2018, and continuing through in or around April 2019, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**ROBERT GOFF III,**

did knowingly and willfully, that is, with the intent to further the object of the conspiracy, combine, conspire, confederate and agree with others, known and unknown to the Acting United States Attorney, to commit an offense against the United States, that is, to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by soliciting and receiving remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of an item or service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

### Purpose of the Conspiracy

17. It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by: (a) soliciting and receiving kickbacks and bribes in return for recruiting and referring beneficiaries, CGx tests, and doctors' orders for CGx tests to laboratories, including Personalized Genetics and Med Health Services; (b) submitting and causing the

submission of claims to Medicare for CGx tests that laboratories, including Personalized Genetics and Med Health Services, purported to provide to those Medicare beneficiaries; (c) concealing the payment and receipt of kickbacks and bribes; and (d) diverting proceeds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

## Manner and Means of the Conspiracy

The manner and means by which the defendant and his co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things, the following:

18. **ROBERT GOFF III** and other co-conspirators entered into an agreement to receive kickbacks and bribes from laboratories, including Personalized Genetics and Med Health Services, in exchange for the recruitment and referral of beneficiaries, CGx tests, and doctors' orders to the laboratories, regardless of whether the CGx tests were medically necessary or eligible for Medicare reimbursement.

19. **ROBERT GOFF III** and other co-conspirators obtained doctors' orders for the CGx tests by paying telemedicine companies kickbacks and bribes for doctors' orders written by doctors contracted with the telemedicine companies, even though those doctors were not treating the beneficiaries for cancer or symptoms of cancer, did not use the test results in the treatment of the beneficiaries, and did not conduct a proper telemedicine visit.

20. **ROBERT GOFF III** and other co-conspirators referred beneficiaries, CGx tests, and doctor's orders to laboratories, including Personalized Genetics and Med Health Services, in exchange for kickbacks and bribes so that the laboratories could submit claims to Medicare for the CGx tests.

21. **ROBERT GOFF III** and other co-conspirators entered into sham contracts with laboratories, including Personalized Genetics and Med Health Services, that disguised the illegal kickbacks and bribes as payments for hourly marketing services.

22. **ROBERT GOFF III** and other co-conspirators caused laboratories, including Personalized Genetics and Med Health Services, to submit claims to Medicare that were procured through the payment and receipt of kickbacks, and Medicare made payments to the laboratories, including Personalized Genetics and Med Health Services, in at least the approximate amount of $1.3 million.

23. **ROBERT GOFF III** and other co-conspirators used the kickbacks received from the laboratories to benefit themselves and others, and to further the scheme.

### Overt Acts

In furtherance of the conspiracy, and to accomplish its object and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

1. On or about July 30, 2018, **ROBERT GOFF III** referred Medicare beneficiary B.S. to Personalized Genetics for the furnishing of a CGx test.

2. On or about September 4, 2018, Personalized Genetics submitted a claim to Medicare for reimbursement for purportedly providing a CGx test to beneficiary B.S., of which Medicare paid approximately $6,513 on or about September 18, 2018.

3. On or about October 11, 2018, **ROBERT GOFF III** created a fake invoice to Personalized Genetics seeking payment of approximately $14,400 for purportedly rendering 57.6 hours of various marketing services to Personalized Genetics.

4.    On or about October 12, 2018, Personalized Genetics caused the payment of approximately $8,568 to **ROBERT GOFF III**, via wire transfer, for the referral of B.S. and other Medicare beneficiaries to Personalized Genetics.

All in violation of Title 18, United States Code, Section 371.

### **FORFEITURE**

1.    The allegations of this Information are re-alleged and by this reference fully incorporated herein for purposes of alleging criminal forfeiture to the United States of certain property in which the defendant, **ROBERT GOFF III**, has an interest.

2.    Upon conviction of a conspiracy to commit a violation of Title 42, United States Code, Section 1320a-7b, as alleged in this Information, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses, pursuant to Title 18, United States Code, Section 982(a)(7).

3.    If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

  a. cannot be located upon the exercise of due diligence;

  b. has been transferred or sold to, or deposited with a third party;

  c. has been placed beyond the jurisdiction of the court;

  d. has been substantially diminished in value; or

  e. has been co-mingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 982(a)(7) and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1).

_____
JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA


_____
TIMOTHY P. LOPER
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

JOSEPH S. BEEMSTERBOER
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

ALLAN MEDINA
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

ALEXI BETHEL,

          Defendant.          /

CASE NO. _____

## CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

Court Division: (Select One)
- [ ] Miami
- [ ] Key West
- [✓] FTL
- [ ] WPB
- [ ] FTP

New defendant(s) [ ] Yes [ ] No
Number of new defendants _____
Total number of counts _____

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.
3. Interpreter: (Yes or No) **No**
   List language and/or dialect _____
4. This case will take __0__ days for the parties to try.
5. Please check appropriate category and type of offense listed below:

   (Check only one)
   - I   0 to 5 days   [✓]
   - II   6 to 10 days   [ ]
   - III   11 to 20 days   [ ]
   - IV   21 to 60 days   [ ]
   - V   61 days and over   [ ]

   (Check only one)
   - Petty [ ]
   - Minor [ ]
   - Misdemeanor [ ]
   - Felony [✓]

6. Has this case previously been filed in this District Court? (Yes or No) **No**
   If yes: Judge _____ Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter? (Yes or No) **No**
   If yes: Magistrate Case No. _____
   Related miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the District of _____
   Is this a potential death penalty case? (Yes or No) **No**

7. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)? (Yes or No) **No**
8. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)? (Yes or No) **No**
9. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)? (Yes or No) **No**

_____
TIMOTHY J. LOPER
DOJ Trial Attorney
Court ID No.    A5502016

*Penalty Sheet(s) attached              REV 3/19/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:**     ROBERT GOFF III

**Case No:**

Count #:   1

Title 18, United States Code, Section 371

Conspiracy to Solicit and Receive Health Care Kickbacks

*__Max Penalty__: Five (5) years' imprisonment

*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | |
| :---: | :---: | :--- |
| v. | ) | Case No. |
| | ) | |
| Robert Goff III, | ) | |
| Defendant | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*